### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SHAYNA E. SANDERS

     *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

     *Defendant*.

_____/

CASE NO. 19-12475

HON. PAUL D. BORMAN
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF No. 13, 15)

## I.    RECOMMENDATION

Plaintiff Shayna Sanders challenges Defendant Commissioner of Social Security's final decision denying her claims for Title XVI Supplemental Security Income benefits ("SSI"). The case was referred to me for review. (ECF No. 4); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's Motion for Summary Judgment, (ECF No. 13), **GRANTING** the Commissioner's Motion, (ECF No. 15), and **AFFIRMING** the Commissioner's final decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff's application for SSI was filed on May 6, 2016. (ECF No. 11, PageID.174–9.) She alleges that the onset date of her disability was December 1,

1

2007. (*Id.*, PageID.174.) The onset date was later amended to May 6, 2016. (*Id.*, PageID.192.) The Commissioner denied the claim. (*Id.*, PageID.103.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred May 10, 2018. (*Id.*, PageID.71–90.) The ALJ issued a decision on June 8, 2018, finding that Plaintiff was not disabled. (*Id.*, PageID.50–66.) The Appeals Council denied review on June 18, 2019. (*Id.*, PageID.39–41.) Plaintiff sought judicial review on August 22, 2019. (ECF No. 1, PageID.1–2.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 13, 15, 16.)

### B.    Standard of Review

The court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See*

*Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286. (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 11, PageID.66.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 6, 2016, the date of the application for SSI benefits. (*Id.*, PageID.55.) At step two, the ALJ concluded that Plaintiff had the

4

following severe impairments: schizoaffective disorder; obesity; asthma; diabetes mellitus; and pes planus. (*Id.*) These impairments did not meet or medically equal a listed impairment in step three. (*Id.*, PageID.56.) Next, the ALJ found that Plaintiff had the residual functioning capacity to perform

> light work as defined in 20 CFR 416.967(b) with the following exceptions: she requires work that is unskilled with 1, 2, or 3 step instructions, that can be learned by demonstration, in a non-fast-rate production environment, defined as involving no hourly quotas and no conveyer belt or assembly line work; [Plaintiff] cannot function as a member of a discrete team and contact with co-workers and supervisors is largely superficial; she should never have direct interactive contact with the public; she requires a "low stress" environment, defined as one having only occasional changes in the work setting; she can lift and/or carry 5 to 10 pounds frequently, and 15 to 20 pounds occasionally; she can stand and/or walk with normal breaks for a total of 4 hours in an 8-hour workday, but can do so for only 30 minutes at a time; she can sit with normal breaks for a total of 6 hours in and 8-hour workday, but can do so for only 1 hour at a time; she can perform pushing and pulling motions with the upper and lower extremities within the aforementioned weight restrictions for no more than 2/3rds of an 8-hour workday; she needs to avoid hazards in the workplace, such as moving machinery and unprotected heights; she should have no concentrated exposure to loud noises; she needs to be restricted to a "relatively clean" work environment, meaning stable temperatures, stable humidity, and good ventilation, that allows the [Plaintiff] to avoid concentrated exposure to dusts, fumes, gases, odors, and other pulmonary irritants; and she can perform each of the following postural activities occasionally; climbing stairs with handrails, balancing, stooping, crouching, kneeling, and crawling, but she needs to avoid climbing ladders, scaffolds, and ropes.

(*Id.*, PageID.57–8.) At step four, the ALJ found Plaintiff has no past relevant work. (*Id.*, PageID.64.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the economy, which included bench assembler, inspector, and packer. (*Id.*, PageID.65.) Accordingly, Plaintiff was found not to be disabled. (*Id.*, PageID.65–6.)

### E.    Administrative Record

### 1.    Overview of Medical Evidence

In December 2010, Plaintiff was admitted to Psychiatric Emergency Services at the University of Michigan. (*Id.*, PageID.277.) Prior to admission, Plaintiff's family reported Plaintiff's erratic behavior, including an assault allegation against her by her sister, taking six or more showers a day, threatening to kill her mother and sister, and sleeping all day and being awake all night. (*Id.*) Plaintiff's mental examination at this time revealed that she is alert and oriented to self, time, place, and situation; she had an angry affect and tangential thought process; she believed that her family was against her; she denies hallucinations or suicidal/homicidal ideations; and her impulse control was impaired. (*Id.*, PageID.279.) Plaintiff was diagnosed with psychotic disorder not otherwise specified, rule out schizoaffective disorder, and obesity. (*Id.*, PageID.280.) This was later described as "paranoid delusional psychosis, presumably related to schizoaffective disorder". (*Id.*, PageID.286.) Plaintiff has psychiatric history of previous attempts of suicide attempts. (*Id.*, PageID.321.) At this point, Plaintiff continued to be hospitalized on an involuntary basis. (*Id.*, PageID.317.) She was described as having limited functioning, and lacking insight into the presence of being mentally ill. (*Id.*)

Plaintiff was court-ordered to be hospitalized, and an alternative treatment order was entered for Plaintiff's treatment on an outpatient basis. (*Id.*) While hospitalized, Plaintiff was initiated on the use of Depakote as a mood stabilizer. (*Id.*) Through her hospitalization, her parents indicated that Plaintiff demonstrated progress and stabilization. (*Id.*)

6

In June 2011, Plaintiff began to have sessions at Huron Valley Consultation Center. (*Id.*, PageID.680.) Plaintiff's chief reported complaint was she wants "help controlling [her] mood, behavior, [and] thoughts." (*Id.*) Here, Plaintiff reported thoughts of phobias, feeling persecuted, and hopelessness. (*Id.*, PageID.681.) She denied any hallucinations, now or ever. (*Id.*) Her sleep and eating was disturbed, and she experienced fatigue. (*Id.*) She was not suicidal. (*Id.*) Her insight was described as fair, her impulse control and judgment were mixed, her social skills were fair, and her strength was her intelligence. (*Id.*) Her primary diagnosis was psychotic disorder, not otherwise specified, rule out schizophrenia and schizoaffective disorders. (*Id.*, PageID.683.)

In November 2015, following her parents' petitioning, Plaintiff was admitted to the hospital psychiatric unit, following threats to the family, noncompliance with medications, internal preoccupation, and history of psychosis. (*Id.*, PageID.327.) At the time of admission, Plaintiff minimized her issues and did not acknowledge psychiatric illness. (*Id.*, PageID.329.) Plaintiff's mental examination revealed an alertness to time, place, and person; shallow affect; slow speech; no suicidal/homicidal ideation; and poor insight and judgment. (*Id.*) There was a diagnosis of schizoaffective disorder by history. (*Id.*)

In January 2016, Plaintiff presented to Psychiatric Emergency Services at the University of Michigan Health System. (*Id.*, PageID.350.) Her complaint was increased auditory hallucinations that kept her from sleeping well. (*Id.*) She was experiencing visual hallucinations as well. (*Id.*) Plaintiff was looking to see if her medications could be changed or if there was assistance to help her sleep. (*Id.*) Plaintiff was given instructions to increase a Trazadone prescription, and she was discharged without incident. (*Id.*, PageID.352.)

7

In December 2016, Plaintiff met with Psychologist Thomas Horner for mental status examination. (*Id.*, PageID.453.) Dr. Horner described Plaintiff as having adequate contact with reality. (*Id.*, PageID.454.) "Motor activity was within normal limits. No unusual behavior was evident. She was poised, relaxed and, though blunted and wary, not unpleasant to interview." (*Id.*) Her impulse control was adequate. (*Id.*) Plaintiff was appropriately spontaneous throughout the interview. (*Id.*) There were no clinically significant blockages of thought. (*Id.*) Dr. Horner observed

> [Plaintiff's] ability to relate positively, reciprocally and effectively with others, including coworkers, customers/clients, and supervisors is essentially intact, though there may be problems of a major nature when psychotic episodes occur. Her abilities to understand, remember and to carry out familiar or customary tasks are intact. Her ability to focus and sustain attention to relevant and customary occupational tasks is similarly intact and operational. [Plaintiff's] ability to withstand or otherwise cope with the stresses of ordinary or customary occupational activity is adequate except as affected by the aforesaid psychotic conditions.

(*Id.*, PageID.455.)

In an annual bio-psycho-social assessment in November 2017, Plaintiff was described as resistant but cooperative, and appropriately groomed. (*Id.*, PageID.491.) She had normal perception and unremarkable thought process. (*Id.*) Her mood was normal with a flat affect; her judgment, impulse control, and insight were fair; and her sleep and appetite were normal. (*Id.*) In contrast, a bio-psycho-social assessment a year earlier in November 2016 showed plaintiff with slightly off perception, but no evidence of hallucination or delusion. (*Id.*, PageID.497.) Her thought process had some questionable logic. (*Id.*) Her judgment and insight were poor. (*Id.*) Her sleep was decreased. (*Id.*) Other factors appear the same.

Plaintiff began working with Dr. Jessica Bright in January 2016. (*Id.*, PageID.447.) Dr. Bright noted that Plaintiff had these symptoms of schizophrenia or other psychotic disorder: hallucinations; disorganized speech or thinking; disturbances in regulating attention; grossly disorganized behavior; social withdrawal; flat affect; poverty of thought or speech; loss of interest; disturbances of mood; odd beliefs; and paranoia. (*Id.*, PageID.676.) Dr. Bright further noted that Plaintiff "seems she overestimates her functioning likely due to cognitive effects of her illness." (*Id.*) Dr. Bright indicated that Plaintiff's abilities to the following were seriously impaired: following one- or two-step instructions; understanding instructions and procedures; sequence multi-step activities; identify and solve problems; and use reason and judgment to make work-related decisions. (*Id.*, PageID.677.) Further, Plaintiff's adaptation skills were generally moderately or mildly limited. (*Id.*, PageID.677–8.) Regarding Plaintiff's sustained concentration, and persistence, Dr. Bright stated, "At this time, this would be impossible" for Plaintiff's ability to complete a normal workday and week without interruption from psychologically based symptoms and to perform at a consistent pace without unreasonable number of rests. (*Id.*, PageID.678.) Dr. Bright estimated that Plaintiff would be absent about once a month from work because of Plaintiff's impairments. (*Id.*, PageID.679.)

Plaintiff regularly had a high BMI. A BMI of 43.33 was reported in March 2016 (*Id.*, PageID.511), 43.94 was reported in June 2016 (*Id.*, PageID.520), 44.40 was reported in December 2016 (*Id.*, PageID.523), 43.1 was reported in January 2017 (*Id.*, PageID.92), 45.31 was reported in March 2017 (*Id.*, PageID.526), 47.13 was reported in August 2017 (*Id.*, PageID.528), and 49.42 was reported in November 2017 (*Id.*, PageID.531).

Plaintiff reported difficulty with increased bronchospasm, which suggested her asthma was getting worse. (*Id.*, PageID.520.)

State Agency Doctor Jerry Csokasy, Ph.D., made a report, on January 9, 2017, of Plaintiff's physical and mental condition. (*Id.*, PageID.58–102.) Plaintiff's medically determinable impairment was listed as schizophrenic, paranoid and other functional psychotic disorders. (*Id.*) She has mild restrictions of activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration or pace. (*Id.*, PageID.96–7.)

Plaintiff's symptoms of understanding limitations, concentration limitations, adaptation limitations, and social interaction limitations were evaluated. (*Id.*, PageID.98.) Dr. Csokasy's assessment was that Plaintiff's symptoms were partially consistent with medical and non-medical evidence of record. (*Id.*) Dr. Csokasy continued, stating Plaintiff complained of "worsening hallucinations when went to ER at UM, but also stated at the same time was able to distract them. Is able to make simple meals, help with shopping and perform self care." (*Id.*)

In reviewing Plaintiff's sustained concentration and persistence limitations, Dr. Csokasy rated Plaintiff's ability to carry out very short and simple instructions as not significantly limited; her ability to carry out detailed instructions and to maintain attention and concentration for extended periods were moderately limited; her ability to perform activities according to schedule, maintain regular attendance, and be punctual within customary tolerances were not significantly limited; her ability to sustain an ordinary routine without special supervision was not significantly limited; her ability to work in

proximity to others and not be distracted was not significantly limited; her ability to make work-related decisions was not significantly limited; and her ability to complete a normal work day was not significantly limited. (*Id.*, PageID.99.) Dr. Csokasy did state that Plaintiff "would have difficulty completing complex tasks on a sustained basis." (*Id.*) Plaintiff's maximum sustained work capability is for unskilled work because of her impairments. (*Id.*, PageID.101.) Accordingly, Plaintiff was determined to be not disabled. (*Id.*)

### 2.     Application Reports and Administrative Hearings

#### a.     Function Report

Plaintiff completed a function report on June 1, 2016 for her application for SSI. (ECF No. 11, PageID.212.) She explained her current conditions limit her ability to work because she is exhausted following a hospital stay. (*Id.*, PageID.205.) Her mobility, day-to-day activities, and health have been ruined or are difficult. (*Id.*) She has pain in her legs that make it hard to stand or walk. (*Id.*) She experiences tremors. (*Id.*) Weight gain and asthma make activities difficult as well. (*Id.*) She has difficulty focusing. (*Id.*)

On a typical day, Plaintiff will go to the gym and workout for 30–40 minutes, return home for breakfast and rest. (*Id.*, PageID.206, 209.) After her lunch, she'll work on chores and errands until dinner and then to bed. (*Id.*) She does not provide care for other people or animals. (*Id.*, PageID.206.)  Before her current condition, she could walk the dog, swim, run, train on an elliptical, go to school, and work on a job. (*Id.*) Her current condition affects her sleep; she is always awakened at 3:00 a.m. (*Id.*)

Plaintiff states that her condition affects her ability to dress, bathe, feed herself, and use the toilet. (*Id.*) She further states that her weight gain makes her unable to fit in her

11

clothes, she is weak when she uses the bathtub, she has difficulty reaching the back of her head for hair care, she says eating food leads to weight gain, and she has to take laxatives. (*Id.*) She needs reminders for the personal care item of doing her hair, but she does not need reminders for medication. (*Id.*, PageID.207.)

The food that Plaintiff prepares is mostly sandwiches or frozen foods, which she can do daily. (*Id.*) Before her current conditions, she could cook full meals. (*Id.*)

Plaintiff is able to do household chores: cleaning, laundry, taking out the trash and preparing quick meals. (*Id.*)

Plaintiff goes outside every day. (*Id.*, PageID.208.) She can travel by walking or driving or riding in a car. (*Id.*) She can go out alone. (*Id.*) Plaintiff can shop in stores, for food, clothes, vitamins, medicine, and shoes. (*Id.*) And she will shop for 1–2 hours per week. (*Id.*)

Plaintiff cannot handle money, such as paying bills, using a savings account, counting change, or using a checkbook. (*Id.*)

Plaintiff's hobbies include watching TV, listening to music, going to the gym or movie theater, and playing games. (*Id.*, PageID.209.) She does not spend time with others. (*Id.*) She does not need reminders to go places, but she needs someone to accompany her. (*Id.*) She says she has trouble getting along with family because she is too old to live at home. (*Id.*, PageID.210.)

Plaintiff states her conditions affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (*Id.*) She states she can lift only 30 pounds,

stand for 30 minutes, and walk one mile. (*Id.*) She can pay attention for 30–55 minutes. (*Id.*) She can follow instructions, but she says it was easier before she was sick. (*Id.*) She can follow spoken instructions. (*Id.*) She is respectful to authority figures, but she feels "that they don't like me." (*Id.*, PageID.211.) She states she does not handle stress or routine change well enough. (*Id.*)

### b.    Plaintiff's Testimony at the Administrative Hearing

At the administrative hearing held on May 10, 2018, Plaintiff testified that she is a 31-year-old Ann Arbor resident. (*Id.*, PageID.74.) She is 5' 8" or 9" and 330 pounds. (*Id.*, PageID.75.) She completed high school and some college courses. (*Id.*). Her claimed impairments are schizoaffective disorder, asthma, and obesity. (*Id.*)

She lives with her parents and sister. (*Id.*, PageID.78.) For her typical day, she is awake between 3:00 and 5:00 a.m. (*Id.*) She will eat, take her medication, listen to music, watch TV, and drive her sister to work. (*Id.*) She takes a Political Science class at the University of Michigan. (*Id.*) She takes one class at a time. (*Id.*, PageID.79.) She will also do errands throughout the day, including going to the grocery store, to the post office, or to the bank. (*Id.*, PageID.78–9.) Her hobbies include Sudoku puzzles, video games, swimming and YouTube. (*Id.*, PageID.79.) She takes naps during the day, and they could be between 45 minutes and five hours. (*Id.*, PageID.80.)

Her ability to sit and stand for lengthy periods of time is limited to two hours and 30 minutes, respectively. (*Id.*, PageID.76.) She can walk one mile in 20 minutes before she needs to rest. (*Id.*) She can lift five to 15 pounds. (*Id.*) She has no issues with climbing stairs (*Id.*, PageID.76–7.) She uses inhalers for her asthma. (*Id.*, PageID.77.) She was

prescribed medication for her mental conditions, and she experiences less frequent (*i.e.* once a day) hallucinations when she takes her medication. (*Id.*) She has difficulty focusing and concentrating, which limits her ability to finish a book, for example. (*Id.*, PageID.80–1.) She cannot tolerate some noises (*Id.*, PageID.81.) She has difficulty remembering things, such as chore-related tasks. (*Id.*, PageID.83.) She is defensive when her mother reminds her to do chores. (*Id.*) She does not need reminders to take her medication, but she needs reminders to get refills for her medication. (*Id.*)

She has never worked full-time. (*Id.*, PageID.79.)

### c.     The Vocational Expert's ("VE") Testimony at the Administrative Hearing

First, the ALJ determined that Plaintiff has no past relevant work based on a review of Plaintiff's earnings record. (*Id.*, PageID.85.)

The ALJ inquired of the VE at the administrative hearing about a hypothetical individual with Plaintiff's characteristics of age, education, and past work experience. (*Id.*) The limitations were as follows:

> Requires work that is unskilled with one, two or three-step instructions learned by demonstration in a non-fast rate production environment defined as one with no hourly quotas and no conveyor belt or assembly line work.
>
> The individual cannot function as a member of a discreet team, and contact with coworkers and supervisors is largely superficial. No direct interactive contact with the public in a low-stress environment defined as having only occasional changes in the work setting. Can lift and/or carry five to ten pounds frequently, and 15 to 20 pounds occasionally.
>
> Can stand and/or walk with normal breaks for a total of four hours in an eight-hour workday, can do for only a half hour at one time. Can sit with normal breaks for a total of six hours in an eight-hour workday, can do so for only one hour at one time. Can perform pushing and pulling motions with

the upper and lower extremities within the aforementioned work restrictions for not more than two-thirds of an eight-hour workday.

Needs to avoid hazards in the workplace such as moving machinery and unprotected heights; no concentrated exposure to loud noises. Needs to be restricted to a relatively clean work environment meaning stable temperature, stable humidity and good ventilation, and we'll ask the individual to avoid concentrated exposure to dust, fumes, gases, odors and other pulmonary irritants.

Can perform each of the following postural activities, occasionally climbing stairs with handrails, balancing, stooping, crouching, kneeling and crawling; but needs to avoid climbing ladders, scaffolds and ropes.

(*Id.*, PageID.85–6.) The VE identified possible jobs, categorized as light work, in the national economy: bench assembler, *DOT*[1] code 739.687-030; inspector, *DOT* code 222.687-010; and packer, *DOT* code 529.687-186. (*Id.*, PageID.86–7.)

The ALJ then presented another limitation to hypothetical number one. (*Id.*, PageID.87.) The limitation was that in addition to regular breaks, off-task time could be up to ten percent of an eight-hour workday, due to impairments or treatment for impairments. (*Id.*) The VE responded that this additional limitation would not affect the stated jobs or the numbers of jobs. (*Id.*)

The ALJ then presented another limitation to hypothetical number one. (*Id.*) Instead of the off-task time of ten percent of an eight-hour workday described above, the off-task time was set at one hour per day. (*Id.*) The VE responded that this additional limitation would preclude the identified jobs and all competitive work. (*Id.*)

Finally, the ALJ then presented another limitation to hypothetical number one. (*Id.*) The limitation was that work would allow two or more workdays per month to be missed

---

[1] *Dictionary of Occupational Titles*

because of impairments. (*Id.*) The VE responded that would also preclude the jobs responding to the stated hypothetical and all competitive work. (*Id.*)

The VE stated her testimony was consistent with the *DOT*. (*Id.*, PageID.88.) However, she stated that certain conditions in the hypothetical were not addressed in the *DOT*, such as absenteeism, breaks, on- or off-task time, alternate positions while performing tasks, interactions with other people, and weight-lifting variations. (*Id.*) For those items, the VE relied on professional experience. (*Id.*)

## F.      Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject

16

to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2).

17

Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

According to SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis

and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *6 (March 16, 2016).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;

19

> (iv)    The type, dosage, effectiveness, and side effects of any medication . . taken to alleviate . . . pain or other symptoms;
> (v)     Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039–40 (6th Cir. 1994); SSR 16-3p, 2016 WL 1119029, at *7 (March 16, 2016).

### G.    Arguments and Analysis

### 1.    The ALJ's determination is supported by substantial evidence, specifically the ALJ properly considered opinion evidence along with other medical evidence of record.

Plaintiff argues that the ALJ erred in considering the opinion of treating physician Dr. Jessica Bright by only providing some weight to her opinion and without articulating a reason—instead of providing controlling weight. Plaintiff is incorrect.

Plaintiff's application for SSI was filed in May 2016. (ECF No. 11, PageID.174.) Accordingly, she is entitled to the treating-source rule. 20 C.F.R. § 416.927.[2] The factors to consider in giving a treating source's opinion controlling weight include: examining relationship; treatment relationship; supportability; consistency; specialization; and other factors. (*Id.*) Opinions of medical sources that the Plaintiff is disabled or unable to work are reserved to the Commissioner. (*Id.*)

---

[2] Defendant does not dispute that Plaintiff had an ongoing treatment relationship with Dr. Bright. (*see e.g.* ECF No. 15, PageID.760.)

Plaintiff states that the ALJ gave Dr. Bright's opinion some weight, rather than controlling weight for three reasons: 1) a medical record was prepared with the assistance of Plaintiff, 2) Dr. Bright does not acknowledge Plaintiff's hospitalizations were the result of noncompliance with medications, and 3) Dr. Bright's assessment is inconsistent with Plaintiff's report of activities. (ECF No. 13, PageID.736.)

In May 2018, Dr. Bright signed off on a medical source statement document. (ECF No. 11, PageID.676–9.) That document includes quotations of Plaintiff's subjective comments relative to factors of her understanding, adaptation, sustained concentration, social interaction, and effects of stress. But this document is not supported or consistent with other record evidence in a similar time period. For example, in February 2018, Plaintiff reported receiving a B- grade in her class, and "the quality of work remembering to do things on time routine and getting things on time is better which she attribute to medication." (*Id.*, PageID.582.) An assessment following this appointment indicated that "[Plaintiff] presents quite well today . . .", that see is better able to talk about her symptoms, and that she is willing to stay on her medication and injections. (*Id.*, PageID.588.)

Dr. Bright stated that Plaintiff "seems she overestimates her functioning . . . likely due to cognitive effects of her illness." (*Id.*, PageID.676.) Further, Plaintiff directs attention to medical records purportedly showing Plaintiff's lack of insight

21

into her condition. (ECF No. 13, PageID.738.) However, in the records indicated over the recent three years, inclusive, the common description of Plaintiff's insight was that it was "limited", and that is an improvement over a 2010 record indicating that Plaintiff "lacked insight into the presence of being mentally ill." (ECF No. 11., PageID.317.) In addition, however, Plaintiff's examination with Dr. Horner did indicate that there "may be problems of a major nature when psychotic episodes occur." (*Id.*, PageID.455), but her abilities remain intact to relate positively with others, to understand and carry out tasks, to focus and sustain attention, and to cope with stresses of ordinary activity. (*Id.*)

The ALJ considered the longitudinal record of Plaintiff's treatment.[3] The ALJ acknowledged that Plaintiff was hospitalized for psychiatric treatment. (*Id.*, PageID.58, citing PageID.270–361, 457–60, 680–714.) In May 2016, Plaintiff reported a great mood; the ability to go around town, shop, go to appointments; and compliance with medication. (*Id.*, PageID.59, citing PageID.406, 413.) In December 2016, in Plaintiff's evaluation by Dr. Horner, Plaintiff "exhibited normal attentiveness, displayed appropriate manners, demonstrated adequate contact with reality, displayed normal motor activity, displayed no unusual behaviors, and although she appeared blunted and wary, she was not unpleasant and was poised and

---

[3] It seems questionable that significant part of Plaintiff's argument, that the ALJ failed to consider the longitudinal records, is reliant on one May 2018 record of Dr. Bright.

relaxed." (*Id.*, citing PageID.454.) Further, "Her stream of mental activity was appropriately spontaneous, there were no clinically significant blockages of thought, and there was no evidence of psychotic symptoms." (*Id.*) In February 2017, Plaintiff denied hearing voices or having visions for about one year, and she is compliant with medication. (*Id.*, citing PageID.583.) In May 2017, her concentration was reportedly fine as she was returning to the University of Michigan for a political science course. (*Id.*, citing PageID.582.) In October 2017, Plaintiff thought she was doing well on her medication, with the only side-effect being weight gain; she had not trouble sleeping and good energy; and was willing to continue medication even if she was not ordered. (*Id.*, citing PageID.542.)

In sum, the longitudinal treatment of Plaintiff showed improvement, and she maintains the capabilities necessary to perform work. "Impairments that are controllable or amenable to treatment cannot support a finding of disability." *Gant. v. Comm'r of Soc. Sec.*, 372 F App'x 582, 585 (6th Cir. 2010) (citing *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984)). Also, the ALJ did not chastise Plaintiff for noncompliance with her medication, *cf. Blakenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989); in context, the ALJ's comments demonstrate the contrast of Plaintiff's conditions when she was non-compliant with medications versus compliant. A favorable reaction to medication is an appropriate question in consideration of one's disability claim, particularly the Plaintiff's

residual functioning capacity. *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017).

### 2. The ALJ properly considered Plaintiff's activities of daily living in relation to her residual function capacity.

Plaintiff argues that there is no nexus between her daily activities and her ability to sustain work on a regular and continuing basis. Plaintiff is incorrect.

Daily activities are one several factors to be considered in crafting Plaintiff's residual functioning capacity. SSR 96-8p. The fact that the ALJ considered Plaintiff's daily activities does not *ipso facto* mean that he primarily relied on that evidence and ignored other record evidence[4] (or the absence of other record evidence). *But cf. Hunter v. Comm'r of Soc. Sec.*, 2006 WL 2092411 (E.D. Mich 2006) (where the ALJ relied *primarily* on Plaintiff's own testimony of daily activities, over physician evidence not in the medical record). To the contrary, in accordance with the first argument, Plaintiff's testimony or the record of her activities, even with some minor variation[5], is consistent with the ALJ's overall view of the medical evidence. Plaintiff retains the ability to perform many ordinary daily activities, whether or not at her pace or direction of her family. This, and in

---

[4] Tellingly, the ALJ indicated "these findings, alone, are not determinative of the issue of disability, in totality, they generally reveal that the evidence of record is inconsistent with the claimant's reports of and testimony regarding severe and disabling conditions." (ECF No. 11, PageID.61–2.)

[5] For example, Plaintiff's testimony before the ALJ indicated she takes one class at a time (*Id.*, PageID.79), but Defendant indicates other records that Plaintiff was enrolled at least one time in two classes at once (*Id.*, PageID.547).

24

accordance with the medical evidence, Plaintiff retains the residual functioning capacity to perform the light work within the limits described by the ALJ.

### H.      Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's Motion, (ECF No. 13), **GRANTING** the Commissioner's Motion, (ECF No. 15), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any

objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 22, 2020                                    S/ PATRICIA T. MORRIS
                                                        Patricia T. Morris
                                                        United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 22, 2020                                    By s/Kristen Castaneda
                                                        Case Manager